UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
CEZARY GWIAZDOWSKI,

                Petitioner,

  -against-

                                          **MEMORANDUM AND ORDER**

ANETTA GWIAZDOWSKA,             14-CV-1482 (FB) (RER)

                Respondent.
---------------------------------------------------x

*Appearances:*

| For the Petitioner: | For the Respondent: |
|---|---|
| ANDRZEJ GASAK | KAMELIA KATRINA POPPE |
| Law Office of Andrzej Gasak | Law Firm of Shaw & Associates |
| 40 Brookdale Rd | 450 Seventh Avenue, Suite 2307 |
| Bloomfield, NJ 07003 | New York, NY 10123 |

**BLOCK, Senior District Judge:**

On February 11, 2014, Cezary Gwiazdowski ("Cezary") brought this petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10494 (Mar. 26, 1986), as implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001–11. Cezary seeks the return to Poland of his two children, K.G. and M.G., who have resided in the United States with Anetta Gwiazdowska ("Anetta"), his wife and the biological mother of the two children, since April 2011.

For the reasons that follow, the Court concludes that although the children's removal from Poland was likely wrongful, Anetta has established that the children are now "settled" in the United States – an affirmative defense under Article 12 of the Hague Convention. Accordingly, Cezary's petition is denied.

The following constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

The Hague Convention, to which the United States and Poland are both signatories,[1] was adopted to "protect children internationally from the harmful effects of their wrongful removal and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, pmbl. In adjudicating a Hague Convention petition, "a United States District Court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim." *Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999).

To prevail on a Hague Convention claim, the petitioner must show by a preponderance of the evidence that (1) the child was habitually resident in one State and was removed to or retained in a different State; (2) the removal or retention was in

---

[1]*See U.S. Hague Convention Treaty Partners*, U.S. DEP'T OF STATE, http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html (last visited March 31, 2015).

breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention. *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005).

Once a petitioner establishes these elements, "the child is to be returned unless the defendant establishes one of four defenses." *Ermini v. Vittori*, 758 F.3d 153, 161 (2d Cir. 2014). One defense is of particular relevance here. Under Article 12 of the Hague Convention, if a Hague Convention petition is filed more than one year after the wrongful removal, the Court "shall . . . order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Hague Convention, art. 12. The respondent bears the burden of establishing this defense by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(2)(B).

Though the Convention does not define the term "settled," the Second Circuit has stated that the term "should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." *Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir. 2012). In adopting the "settled" defense, "the Convention's framers recognized that . . . there could come a point at which a child would become so settled in a new environment that repatriation might not be in its best interest." *Blondin*, 238 F.3d at 164.

**II.**

The Court held a hearing on March 26 and 30, 2015, at which the Court heard testimony from Cezary and Anetta. With consent from both parties, the Court interviewed K.G. (age 10) and M.G. (age 8) *in camera* outside of the presence of the parties and their respective counsel.[2] The parties also submitted various documents into evidence, including (1) school report cards for K.G. and M.G., (2) immigration documents for Anetta and the children, and (3) documents from Queens County Family Court ("Family Court") relating to custody petitions filed by Cezary and Anetta.

**A.   Background**

Cezary and Anetta met in Elbląg, Poland, in 1996 and became romantically involved. At that time, they were both studying to become physicians. In July 2003, the couple married in a Polish Catholic church in Brooklyn, New York, a choice they made so that Anetta's mother, who lives in Maspeth, New York, could attend the wedding. The couple returned to Elbląg soon afterwards and had two sons, K.G., born in 2004, and M.G., born in 2008.

Cezary and Anetta presented vastly different accounts of their life together in Poland. According to Anetta, their relationship, while always troubled, became substantially worse when M.G. was born, at which point Cezary became an "abusive

---

[2]This procedure "is consistent with those adopted by district courts in Hague Convention cases." *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 187 n.1 (E.D.N.Y. 2010).

and controlling man" who often hit her. Tr. of March 30, 2015 Hr'g at 9. Cezary admitted that their relationship had problems but vehemently denied hitting or abusing Anetta. Rather, he stated that "[t]he only domestic violence in our home . . . was violence, mainly mental, against me by my wife." Tr. of March 26, 2015 Hr'g at 38.

The Court credits the parties' statements that the relationship was troubled. However, since the question of whether Cezary committed domestic violence is irrelevant to the Court's adjudication of this petition – and since the factual picture is murky given the lack of supporting documentation for the parties' claims – the Court declines to decide whether the relationship was marred by physical abuse.

**B.     Anetta's Relocation to the United States**

On April 11, 2011, Anetta left Poland with the children and moved into her mother's home in Maspeth. Anetta did not inform Cezary that she was taking the children or obtain his consent to do so. Rather, Cezary discovered that Anetta had left when he "came back from work and . . . saw [an] empty flat." Tr. of March 26, 2015 Hr'g at 13.

For the first several months following her departure, Cezary held out hope that she would return to Poland and resume their life together, though the couple spoke infrequently on the phone. However, in early 2012, Anetta informed Cezary that she did not intend to return to Poland and wanted to file for divorce. Cezary then traveled to New York in March 2012 to speak to her and the children in person. When Anetta

5

refused to meet with him or let him speak with the children, Cezary consulted a lawyer and filed a custody petition in Family Court. He returned to Poland in April 2012, and soon thereafter submitted a letter to the United States Department of State ("Department of State") requesting the return of the children under the Hague Convention.

The Family Court proceedings apparently languished until late 2013, when Anetta filed her own custody petition in Family Court. Her petition was consolidated with – or at least assigned the same Docket and File Number as – Cezary's custody petition.[3]

On June 10, 2014, the Department of State sent a letter to the Family Court informing the court that Cezary had filed an application with the Department of State for the return of the children. The letter further informed the Family Court that, under Article 16 of the Hague Convention, the court should defer decision on the merits of rights of custody until Cezary's Hague Convention petition was adjudicated.[4]

---

[3]During the pendency of the Family Court proceedings, Cezary was permitted to speak with Anetta and the children three times a week over Skype, and was permitted to occasionally visit the children in the United States. Since March 2012, he has visited the children approximately five times a year, including attending K.G.'s First Holy Communion in 2014.

[4]*See* Hague Convention art. 16 ("After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention. . . .").

Despite this letter, on December 17, 2014, the Family Court entered a final order in Anetta's custody proceeding. The order granted legal and physical custody of the children to Anetta, and granted Cezary visitation with the children on a schedule set by the Family Court, subject to the condition that "[Cezary] must not remove the children outside and beyond the United States" and that "[t]he children's passports are to remain in the possession of [Anetta]." Decl. of Kamelia Poppe, Ex. F ("Final Order of Custody after Inquest") at 9.

Cezary and Anetta have so far complied with the order. In February 2015, Cezary traveled to the United States and went on vacation with the children to the Pocono Mountains in Pennsylvania. Cezary plans to return to the United States in April 2015 for M.G.'s First Holy Communion. When he is in Poland, Cezary speaks with his children on Skype every Monday, Wednesday, and Friday, though he complained that "maybe 30 percent of [the time] they are not available." Tr. of March 26, 2015 Hr'g at 50.

## III.

The Court concludes that Anetta's removal of the children in April 2011 was likely wrongful under the Hague Convention. First, the children were habitually resident in Poland at the time of the removal. Second, Cezary was exercising his custody rights at that time, since Cezary and Anetta lived together and had joint custody of the children at the time of removal. Finally, Anetta's removal of the children appears

7

to have been in breach of Cezary's custody rights under Polish law. *See In re Skrodzki*, 642 F. Supp. 2d 108, 115 (E.D.N.Y. 2007) (concluding that mother who unilaterally removed children from Poland to the United States breached father's custody rights under Polish law).

However, even if the removal was wrongful, the Court finds that Anetta has established that the children are now settled in the United States. As a threshold matter, it is undisputed that this petition was filed almost three years after Anetta's removal of the children from Poland, and so the "settled" defense is available to Anetta. *See* Hague Convention, art. 12. Furthermore, "the 1–year period in Article 12 of the Hague Convention is not subject to equitable tolling." *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1236 (2014).

To determine whether a child a settled, a district court must consider a variety of factors, including:

> (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

*Lozano*, 697 F.3d at 57. The Court will address these factors in turn.

A.  **Stability**

The stability of a child's residence "plays a significant role in the 'settled' inquiry." *In re D.T.J.*, 956 F. Supp. 2d 523, 535 (S.D.N.Y. 2013). K.G. and M.G. have lived at Anetta's mother's house since moving to the United States and feel comfortable in their home environment. The Court concludes that the children have a stable and happy home in New York, a fact that goes far towards determining that the children are settled. *Compare id.* at 534-535 (finding a settled environment where child "credibly presented as extremely content with her living situation"), *with In re Koc*, 181 F. Supp. 2d 136, 153 (E.D.N.Y. 2001) (concluding that child is not settled because she lived in three different homes and attended three different schools during her two-and-a-half years in the United States).

B.  **Friends and Relatives**

Cezary acknowledged that the children have a group of friends in school here, *see* Tr. of March 26, 2015 Hr'g at 46, a fact confirmed by K.G. and M.G. during the *in camera* interview. By contrast, the children do not appear to have significant attachments to Poland. Further, while the children have several relatives who live in Poland, Anetta testified that most of their family members live eight hours from Elbląg by train and Cezary did not dispute this fact. *See* Tr. of March 30, 2015 Hr'g at 21. It is therefore unclear how much contact the children would have with these family members even if they lived with Cezary in Elbląg.

## C. School and Church Attendance

K.G. and M.G. have attended Saint Stanislaus Kostka School in Maspeth, New York, since August 2011. The children's school records demonstrate that they are in regular attendance and receive good grades. In addition, both parents acknowledged that K.G. and M.G. regularly attend church in the United States. K.G. received his First Holy Communion in 2014, while M.G. is scheduled to receive his First Holy Communion in April of this year.

## D. Age

K.G., who is 10 years old, and M.G., who is 8, are old enough to form meaningful attachments to their new environment. *See In re Robinson*, 983 F. Supp. 1339, 1345 (D. Colo. 1997) (concluding that 10-year-old and 6-year-old "are old enough to allow meaningful connections to the new environment to evolve . . . [while] children of a very young age are not").

## E. Anetta's Financial Stability

Anetta is not currently employed in the United States but is attending university and studying to receive a medical license in the United States. It is unclear whether Anetta will be able to find employment once she completes her studies or how much she will earn if she does. However, Anetta testified that her mother and stepfather, who collectively earn approximately $200,000 a year, significantly contribute towards the children's expenses.

### F. Immigration Status

As the Second Circuit has noted, "[t]he importance of a child's immigration status [for the 'settled' defense] will inevitably vary for innumerable reasons, including: the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits." *Lozano*, 697 F.3d at 57.

Anetta and the children are currently residing in the United States on F1 nonimmigrant visas, which allow them to remain in the United States as long as Anetta remains in school. The fact that the children are here legally is a positive factor in the "settled" analysis. *See Demaj v. Sakaj*, No. 3:09-CV-255, 2013 WL 1131418, at *23 (D. Conn. Mar. 18, 2013) (concluding that mother and children's approval for nonimmigrant U visas supported the mother's "settled" defense). However, the Court is unclear whether Anetta will be able to obtain legal residence in the United States when her student visa ends, and Anetta presented no evidence of how she intends to pursue legal status upon completion of her studies.

* * *

After weighing all of these factors, the Court concludes that Anetta has met her burden of demonstrating by a preponderance of the evidence that the children are settled in their current environment. The children have a stable home environment and a solid group of friends, and they regularly attend school and church here. While there is some

uncertainty about Anetta's financial stability and about the children's future immigration status, all of the other factors point to the fact that the children have "become so settled in [their] new environment that repatriation [is] not . . . in [their] best interest." *Blondin*, 238 F.3d at 164. Accordingly, the Court finds that the elements of the Article 12 defense have been met.

The Court has also considered whether it should exercise its discretion to repatriate K.G. and M.G. notwithstanding that Anetta has established an affirmative defense under the Hague Convention. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) ("[A] federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention."). Since there is no evidence that Anetta's relocation to the United States was motivated by a desire to remove the children to a jurisdiction more favorable to her custody claims, the Court sees no reason to do so. *See In re D.T.J.*, 956 F. Supp. 2d at 549 (declining to exercise discretion to remove children, notwithstanding affirmative defense, because there was no evidence that mother removed children to obtain a more favorable custody ruling).

**IV.**

Cezary has submitted a post-hearing letter asking the Court to vacate the Family Court custody order because it was entered in violation of the Hague Convention. *See* Hague Convention, art. 16 (providing that the state to which the child has been removed

"shall not decide on the merits of rights of custody" until "it has been determined that the child is not to be returned under the Convention").

If the Court had granted Cezary's petition, vacation of the Family Court order would be appropriate, since Poland would then be the correct forum to determine rights of custody. *See Mozes v. Mozes*, 239 F.3d 1067, 1085 n.55 (9th Cir. 2001) (noting that federal courts "must have the power to vacate state custody determinations and other state court orders that contravene the [Hague Convention]"). Here, however, the Court has determined that the United States is the appropriate forum to determine rights of custody. Accordingly, vacating the custody order now would simply be an academic exercise that would compel the parties to return to Family Court and repeat the process again. This would inflict a needless financial and emotional burden upon Anetta and would likely have a deleterious effect on the children's stability and well-being.

Since there is no compelling reason to do so, the Court therefore declines to vacate the Family Court order.[5]

---

[5] The Court notes that the parties can petition the Family Court to modify the custody order. *See, e.g., Nusbaum v. Nusbaum*, 964 N.Y.S.2d 628, 630 (2d Dep't 2013). The parties could also mutually agree to modify the custody order. *See* Final Order of Custody After Inquest at 10 ("The parties may expand and/or modify the Father's access to the children upon their mutual consent."). Though the parties were unfortunately unable to resolve their differences at the hearing, the Court hopes that, given the obvious love both parents have for the children, the parties will be able to come to such an amicable resolution in the future.

13

## V.

For the foregoing reasons, Cezary's petition is denied.

**SO ORDERED.**

/s/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
April 3, 2015